IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Applicant,

    v.

HOMENURSE, INC.,

        Respondent.

CIVIL ACTION FILE NO.

1:13-CV-02927-TWT-WEJ

## ORDER

This matter is before the Court on an Application for an Order to Show Cause Why an Administrative Subpoena Should Not be Enforced [1], filed by the Equal Employment Opportunity Commission ("EEOC").  For the reasons explained below, said Application is **DENIED** and the EEOC's Fourth Subpoena is **QUASHED**.

## I.   BACKGROUND

### A.   The Charge

This dispute arises out of the EEOC's investigation of a Charge of Discrimination [4-2] filed by Ms. Christie F. Carroll against Respondent, HomeNurse, Inc. ("HNI"), on May 20, 2010.  In that Charge, Ms. Carroll placed check marks in

blocks asserting discrimination based on race, age, disability, and genetic information, as well as retaliation, and alleged the following particulars of discrimination:

> I.)  I was hired by the above employer on or about March 3, 2009, as a Staffing Coordinator.  On February 20, 2010, I complained to Lacrecia Brookshire, District Manager, and Tracy Cash, District Man[a]ger, that the pre-hire screening information was discriminatory.  On or about April 27, 2010 I was terminated.
>
> II.)  I believe I have been retaliated against because I participated in a protected activity, in violation of the Americans with Disabilities Act of 1990, as amended [("ADA")], and the Genetic Information Nondiscriminat[ion] Act of 2008 [("GINA")].
>
> III.)  I believe that individuals with disabilities as a class, individuals in the protected age group as a class and individuals with pre-existing genetic conditions as a class are being discriminated against in violation of Title I of the Americans with Disabilities Act of 1990, as amended; the Age Discrimination in Employment Act of 1967, as amended [("ADEA")]; and the Genetic Information Nondiscriminat[ion] Act of 2008.  I believe that the Respondent's policy of not hiring individuals who have conviction records adversely affects African Americans as a class with regards to hiring, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(EEOC Charge.)

Ms. Carroll signed the Charge, but she did not assert that she was filing it on behalf of any person claiming to be aggrieved.  (EEOC Charge.)  Although the Charge asserts class-wide discrimination by HNI against individuals with disabilities, individuals age forty and over, individuals with pre-existing genetic conditions, and

African Americans, it is undisputed that Ms. Carroll is not disabled, is under age forty, has no pre-existing genetic conditions, and is Caucasian.  Thus, the only adverse employment action that she could have suffered was retaliation.

### B.   The EEOC's Raid on HNI's Calhoun Office[1]

The EEOC launched its investigation of the Charge in May 2010 by conducting a raid on HNI's Calhoun office "as if it were the FBI executing a criminal search warrant."  (HNI's Resp. 6.)  The EEOC showed up unannounced with subpoenas[2] in hand, intimidated the staff of that small office,[3] and began rifling through HNI's

---

[1] The Court takes the description in the text following this note from HNI's Response to Application for Order to Show Cause [4] ("HNI's Resp.").  The EEOC did not refute this description.  (See Reply Br. in Supp. of Appl. for Order [7] ("EEOC's Reply Br.").)  Instead, the EEOC described this clear misuse of its authority as if it were some ordinary event:  "On May 28, 2010, the Charge was hand-served on Respondent along with Subpoena AT-10-79 . . . ."  (See Mem. of Law in Supp. of Appl. for Order [1-1] 3 ("EEOC's Mem.").)

[2] One of the subpoenas directed HNI District Manager Tracey Cash (No. AT-10-079) to "produce access to the evidence described below for the purpose of examination or copying to John Jarvis, Investigator of the [EEOC] at 100 Alabama Street SW, Suite 4R30, Atlanta, GA on May 28, 2010 at 10:00 o'clock."  (Subpoena [4-3] 2.)  The other three subpoenas directed Lacrecia Brookshire (No. AT-10-076), Tammy Nelson (No. AT-10-078), and Dayna Veit (No. AT-10-077) to testify before Mr. Jarvis at the above Atlanta address at 10:00 a.m. on May 28, 2010.  (Id. at 5-12.)

[3] HNI's home office is in Griffin, Georgia, and none of its senior management works in the Calhoun office.  (Able Decl. [4-1] ¶ 3.)

3

confidential personnel and patient files.  The EEOC did not allow HNI any meaningful

opportunity to object to the subpoenas as required by its own procedural regulations.

(Id., citing 29 C.F.R. § 1601.16(b)[4].)  Indeed, HNI asserts that this unauthorized and

abusive search and seizure was halted only when its attorneys became aware of the raid

and placed a telephone call to the office of EEOC Regional Attorney Robert Dawkins.

By that time, however, EEOC personnel had already rummaged through a significant

---

[4] The regulation which the EEOC ignored provides as follows:

(b)(1)  Any person served with a subpoena who intends not to comply
shall petition the issuing Director . . . to seek its revocation or
modification.  Petitions must be mailed to the Director . . .within five
days (excluding Saturdays, Sundays and Federal legal holidays) after
service of the subpoena. . . .  A copy of the petition shall also be served
upon the issuing official.

   (2)  The petition shall separately identify each portion of the subpoena
with which the petitioner does not intend to comply and shall state, with
respect to each such portion, the basis for noncompliance with the
subpoena.  A copy of the subpoena shall be attached to the petition and
shall be designated "Attachment A."  Within eight calendar days after
receipt or as soon as practicable, the . . . Director . . . shall either grant the
petition to revoke or modify in its entirety or make a proposed
determination on the petition, stating reasons, and submit the petition and
proposed determination to the Commission for its review and final
determination. . . .  The Commission shall serve a copy of the final
determination on the petitioner.

amount of HNI's files and, upon information and belief, illegally took documents from those files.  (Id.)

## C.   HNI's Position Statement

On June 28, 2010, HNI submitted its position statement [4-4, 4-5] in response to Ms. Carroll's retaliation allegation (i.e., the only allegation in the Charge that HNI asserted was applicable to her).  In that document, HNI explained that Ms. Carroll was not terminated in retaliation for engaging in protected activity, but rather because she posted confidential patient information on her Facebook page in violation of several company rules and polices, including HNI's HIPPA Confidentiality and Non-Disclosure Agreement.  (See June 28, 2010 Position Statement [4-4] 5.)  HNI also notified the EEOC that, in the spirit of cooperation, it would provide a separate position statement responding to Ms. Carroll's class allegations–although she did not fall within any of the classes identified in those allegations.  (Id. at 2.)[5]

_____

[5] HNI submitted that supplemental position statement [4-6] on December 16, 2010, showing that Ms. Carroll had been disqualified from receiving unemployment compensation benefits because she admitted at a hearing that she had posted confidential patient information on her Facebook page, and that she was terminated for posting that information.  According to HNI, the transcript of that hearing (which was not filed with this Court) also reflected that Ms. Carroll did not claim that she was terminated in retaliation for engaging in protected activity.  (Id. at 2-3.)

5

**D.    The EEOC's September 7, 2010 Request for Information**

In a letter [4-7] dated September 7, 2010, EEOC Investigator Jarvis requested that HNI provide certain information for all individuals it employed during the period April 1, 2008, through September 7, 2010,[6] and that HNI provide employment information and application packets submitted by all individuals who sought employment with it during the same time period.[7]  Mr. Jarvis requested that the information be provided in only seven business days, or by September 16, 2010.  (Id.) Because the EEOC's request called for HNI to pull files for several thousand applicants/employees and extract information from them, the vast majority of which were paper files located in storage, counsel for HNI responded to Mr. Jarvis stating that, as a result of the voluminous nature of the request, his client would need an extension through October 11, 2010 to respond.  (See letter [4-8] of Sept. 9, 2010 from

---

[6] For each individual, the EEOC requested the following data:  name, date of birth, title, date of hire, date of and reason for separation, if applicable, and last known home telephone number and address.  (See letter dated Sept. 7, 2010.)

[7] For each individual, the EEOC requested the following data:  name, date of birth, reason not hired, office where they applied, time of and person who conducted the interview, if applicable, and name of person who made the determination.  (See letter dated Sept. 7, 2010.)

6

T. Wozniak to J. Jarvis).[8]  The EEOC granted that extension request.  (See Decl. of EEOC Atlanta Dist. Dir. B. Williams-Kimbrough [1-2] ¶ 4. f.)

On October 4, 2010, counsel for HNI sent Mr. Jarvis an update on his client's data collection efforts.  (See letter [4-9] of Oct. 4, 2010 from T. Wozniak to J. Jarvis.) Counsel advised that the information requested was extremely voluminous, that nine banker's boxes of documents (an estimated 20,000 pages) had already been collected, and that the information requested contained personal and confidential information for individuals other than the Charging Party.  (Id.)  In an effort to minimize the expense associated with the volume of information involved and to preserve the privacy rights of non-parties, HNI requested to schedule a meeting with the EEOC for the purpose of (1) showing the EEOC samples of the records requested so that the parties could discuss the most efficient and appropriate method of getting the EEOC the information it needed to conclude the investigation, and (2) discussing conciliation of the allegations in the Charge to the extent they concerned HNI's hiring practices.[9]  (Id.)

---

[8] More than 3,600 individuals worked for HNI during the time period identified in the EEOC's request, and more than 2,200 individuals applied for employment with it during that time period.  (Able Dec. ¶ 7.)

[9] HNI also wrote that the meeting would be useful for explaining some of its hiring practices alleged to have been unlawful, which could greatly assist the EEOC in focusing its investigatory efforts and save the parties from the needless expenditure

7

Thirty days later, on November 4, 2010, Mr. Jarvis reported to counsel for HNI that he had not been able to reach Mr. Dawkins (the EEOC Regional Attorney) for the last month to discuss HNI's request to meet.[10]   Mr. Jarvis requested that, in the meantime, HNI provide three sample files for applicants and an additional three sample files for current and former employees.  Counsel for HNI responded that his client would produce application packets for three random applicants, but that he did not understand the relevance of the request for current and former employee information, given that the class allegations appeared to be made on behalf of applicants who were not hired.  In response, Mr. Jarvis stated only that the request was relevant because the

---

of time and expense.  (See letter of Oct. 4, 2010.)  For example, as counsel for HNI explained in his letter, the Charging Party had made an uninformed allegation that HNI maintains a policy of refusing to hire applicants with criminal conviction records.  (Id.) HNI asserted that it does not maintain such a blanket policy.  Instead, because many of HNI's patients are Medicaid recipients, HNI is required to enroll in the Georgia Plan for Medical Assistance (the "Medicaid Program") administered by the Georgia Department of Community Health, Division of Medical Assistance (the "Department") and comply with that Department's policies and procedures, including its requirements that HNI screen each potential applicant for criminal background history and not hire individuals who have been convicted of certain crimes, including crimes involving abuse, neglect, sexual offenses, robbery, and financial exploitation.  (Id.) HNI asserted that it endeavors to comply with the rules and regulations of the state agencies that regulate it.  Moreover, HNI wanted to ensure that its patients are not subject to abuse, exploitation, robbery, sexual offences or neglect.

[10] It is inconceivable that two men who work for the same agency in the same office could not communicate within a thirty-day period.

8

Charging Party was an employee alleging termination, but that he would discuss the relevance issue with Mr. Dawkins.  (<u>See</u> HNI's Resp. 9-10.)[11]  HNI forwarded three random application packets to Mr. Jarvis the next day, November 5, 2010.  (<u>See</u> letter [4-10] of Nov. 5, 2010 from B. Lane to J. Jarvis.)

Another month passed without the EEOC responding to HNI's request to meet and confer.  As a result, on December 6, 2010, counsel for HNI wrote directly to Mr. Dawkins to request, for a second time, a meeting to discuss and conciliate certain allegations raised in the Charge.  (<u>See</u> letter [4-11] of Dec. 6, 2010 from T. Wozniak to R. Dawkins.)  Counsel explained that (1) his firm had fully audited HNI's hiring practices and had corrected, as of June 2, 2010, any process that could even arguably raise a concern; (2) HNI was prepared to sit down and discuss its hiring practices in light of the Charge; and (3) HNI had collected and reviewed over 20,000 pages of documents responsive to the EEOC's information requests.  (<u>Id.</u>)  As identified in the letter, HNI's overarching desire in requesting the meeting was to collaborate with the EEOC on methods to streamline the investigation so as to reach a prompt and efficient resolution of the Charge.  (<u>Id.</u>)

---

[11] The statements preceding this note are representations of HNI's counsel and are not supported by a record citation.  However, the EEOC has not challenged these statements in its Reply Brief.

9

**E.      The March 2011 Conference Call and the EEOC's Decision to Subpoena Information that HNI Had Already Agreed to Produce**

Another three months passed without the EEOC responding to HNI's latest request to meet, confer and conciliate.  Then, in March 2011, Mr. Dawkins and Natasha Barton, EEOC Enforcement Supervisor, agreed to engage in a conference call with counsel for HNI to discuss the EEOC's information requests.  Although Mr. Dawkins and Ms. Barton refused HNI's request to meet in order to work towards conciliation, the parties were able to agree on a process for responding to the EEOC's information requests.  The parties agreed that HNI would provide, for the time period January 1, 2009 through the present (March 2011):  (1) all applications received, whether the applicant was hired or not; (2) a spreadsheet providing certain information for all employees who worked for HNI during the identified time frame; and (3) supporting documentation for any individual terminated for misconduct during the identified time frame.  On the day following the parties' conference call, Ms. Barton sent an email to counsel for HNI memorializing and confirming the parties' agreement.  (See email [4-12] dated Mar. 15, 2011 from N. Barton to T. Wozniak.)

HNI originally anticipated being able to produce the requested information by April 29, 2011; however, as a result of the volume of information requested and the

10

time-intensive nature of creating the spreadsheets for the EEOC, HNI wrote Ms. Barton to advise that it would need an additional three weeks. (See letter [4-13] of Apr. 29, 2011 from D. Long-Daniels to N. Barton.) Mr. Jarvis responded on May 4, 2011, acknowledging and agreeing to the date for production; however, Mr. Jarvis also stated that a subpoena would be issued for the requested information. (See email [4-14] of May 4, 2011 from J. Jarvis to D. Ward.) In an email sent the next day, Mr. Jarvis confirmed that the subpoena to be issued was for information HNI had already agreed to produce. (See email [4-15] of May 5, 2011 from J. Jarvis to D. Long-Daniels.)

Given that HNI believed that there was no need for the EEOC to issue a subpoena for information over which the parties had already negotiated an agreement, and because HNI believed that such a subpoena would be moot upon its issuance, counsel for HNI objected to the subpoena. (See letters of May 5 and 6, 2011 [4-16] from D. Long-Daniels to J. Jarvis.). In an email dated May 9, 2011, Mr. Dawkins confirmed that the subpoena would be moot if HNI produced the information agreed upon by the parties in their telephone conference. (See email [4-17] of May 9, 2011 from R. Dawkins to D. Long-Daniels.) Nevertheless, the EEOC served HNI with Subpoena No. AT-11-064 [4-18] (the "Second Subpoena") the next day.

11

As counsel for HNI had feared, the Second Subpoena required HNI to expend additional attorney's fees and resources needlessly.  Although the requests in the Second Subpoena were, by the EEOC's representations, supposed to conform to the agreement reached by the parties in their March telephone conference, they were more expansive.  As a result, HNI was forced to protect its interests by filing a Petition to Revoke or Modify the Second Subpoena [4-19] on May 17, 2011.  Three days later, on May 20, 2011, HNI produced the mutually agreed information, including over 13,000 pages of documents and two spreadsheets providing information for over 2,500 individuals.  (HNI's Resp. 13-14; see also Williams-Kimbrough Decl. ¶ 4. m.)

**F.    The EEOC Blames HNI for Its Own Miscommunication and Issues a Third Subpoena**

Four days after HNI's production, Ms. Barton of the EEOC called counsel for HNI inquiring as to why his client had produced only applications received during the identified time period as opposed to all documents contained in the "application packets" for those applicants.  HNI's counsel asserts that Ms. Barton's inquiry was odd, given that she had drafted the confirmatory email of the parties' agreement that HNI would "provide all applications received." (See email of Mar. 15, 2011 from N. Barton to T. Wozniak.)  As represented by HNI's counsel, and not rebutted by the

EEOC in its Reply Brief, the parties did not discuss in their March conference call producing any documents contained in "application packets" other than the actual applications, nor did Ms. Barton's confirmatory email even mention those other documents. (HNI's Resp. 14.) When counsel for HNI informed Ms. Barton of this fact, she chastised him for not calling to clarify whether her seemingly unambiguous request for applications was actually a request for everything contained in the application packets. (Id.)

After Ms. Barton's call, counsel for HNI sent Ms. Barton a letter confirming that, although she had requested only applications, she had intended to request "application packets," which presumably included documents in addition to the applications that were actually requested. (See letter [4-20] of May 24, 2011 from D. Long-Daniels to N. Barton.) Counsel for HNI also asked Ms. Barton to state her exact request for "application packets," as well as any future requests, with precision so as to avoid any further miscommunication. (Id.)[12]

---

[12] The EEOC asserts that HNI has "brought much of the cost upon itself by attempting to evade the requests." (EEOC's Mem. 21.) In an effort to prove its point, the EEOC focuses on the episode discussed in the preceding text, arguing that it

> engaged the Respondent in a phone conference to define the scope of the investigation, with both parties understanding the Charge implicated the full application packet process used by the Respondent. Instead of

13

Ms. Barton responded immediately, again chastising counsel for HNI for complying with the plain language of her request instead of calling to clarify what she had intended, but failed, to request. (See letter [4-12] of May 24, 2011 from N. Barton to D. Long-Daniels.)   Ms. Barton also accused HNI of failing to respond to the EEOC's information requests for the past eight months and threatened that she would seek any further information requests through subpoena. (Id.).   According to HNI, Ms. Barton's accusatory and hostile tone was disappointing, given that it had just spent over $80,000 producing more than 13,000 pages of documents and two voluminous spreadsheets–only to be told that its production was incomplete because of Ms. Barton's miscommunication. (HNI's Resp. 15-16.)

Counsel for HNI responded to Ms. Barton to correct the misstatements in her letter and to outline its concerns over the way the EEOC was handling this matter. (See letter [4-22] of May 25, 2011 from D. Long-Daniels to N. Barton.)   In the letter,

---

producing *all* the application packets for the relevant time period, the Respondent attempted first to supply only single applications.

(Id. at 21-22.)   The EEOC cites no evidence to support this argument; indeed, the EEOC cannot reasonably assert that "both parties" understood that the full application packet would be produced when the EEOC's own confirming email mentions only "applications." (See email dated Mar. 15, 2011 from N. Barton to T. Wozniak.) Given the above facts, the EEOC's assertion that HNI has brought most of the cost here "upon itself" is not credible.

14

counsel for HNI also expressed its concern over Ms. Barton's threat to introduce any new information requests through subpoena. (Id.)  As counsel for HNI explained, this strategy appeared to be retaliatory against his client for Ms. Barton's own imprecise communications, and would be an extremely inefficient way to conduct discovery. (Id.).  HNI's counsel requested, as it had been for several months, that the EEOC participate in discussions about the information it was requesting so that the parties could work out an effective and cost-efficient plan for production.  (Id.).

The EEOC responded on June 9, 2011, not by engaging in discussions concerning its information requests, but by sending HNI another subpoena, No. AT-11-091 [4-23] (the "Third Subpoena").  The Third Subpoena requested, for the period January 1, 2009 through the present (June 9, 2011) application packet documents Ms. Barton had apparently intended to request earlier.  The Third Subpoena requested seven types of documents for each applicant, whether the applicant was hired or not:

(1)    aid availability and information sheets;

(2)    HomeNurse work reference forms;

(3)    consumer report authorization and disclosure forms;

(4)    motor vehicle report ("MVR") authorization forms;

15

(5)    personal reference forms;

(6)    reference letter/performance evaluation forms; and

(7)    medical history questionnaires.

(<u>See</u> Third Subpoena.)

Although HNI had previously explained to the EEOC that a request of this nature could involve collection and production of over 50,000 pages of documents, the Third Subpoena gave HNI only twelve days to respond.  Because the EEOC refused to engage Respondent in any discussion regarding the relevance of its requests or the time frame required to respond to those requests, HNI asserts that it was forced to file a Petition to Revoke or Modify the Third Subpoena.  (<u>See</u> Pet. to Revoke or Modify Third Subpoena [4-24, Attach. A].)  In its Petition, HNI outlined its objections to the specific categories of documents sought and stated that it would produce all non-objectionable documents within thirty days.  (<u>Id.</u>)  Finally, HNI again pleaded with the EEOC to consider the unnecessary expense it was placing on HNI (as well as its own office) by investigating this matter in the manner it had chosen.  (<u>Id.</u>)

Counsel for HNI also sent a separate letter to Mr. Dawkins on the same day expressing his disappointment with the EEOC's imprudent and wasteful decision to communicate only through subpoena.  (<u>See</u> letter [4-24] of June 21, 2011 from D.

16

Long-Daniels to R. Dawkins.)  Counsel also advised Mr. Dawkins of yet another abusive practice of which he had recently become aware–the EEOC surreptitiously interviewing HNI's management employees and taking written statements without providing notice to HNI.  (Id.)  Mr. Dawkins did not respond.  Moreover, the EEOC did not refute in its Reply Brief that its personnel had engaged in this inappropriate conduct.

On July 21, 2011, HNI made its production of non-objectionable documents pursuant to the Third Subpoena, bringing its total production to over 25,000 pages. (HNI's Resp. 19.)  According to the EEOC, HNI produced the following documents for individuals who submitted applications to it between January 1, 2009 and July 20, 2011, but were not hired:

> (1)    aide availability and information sheets;
>
> (2)    HomeNurse work reference forms;
>
> (3)    consumer report authorization and disclosure forms; and
>
> (4)    medical history questionnaires.

(Williams-Kimbrough Decl. ¶ 4. p.)  However, according to the EEOC, HNI refused to produce any of the requested documents, with the exception of medical history questionnaires, for individuals it hired and/or employed between January 1, 2009 and

17

July 20, 2011, and/or for individuals it terminated between January 1, 2009 and July 20, 2011.  (Id. ¶ 4. q.)

## G.   The EEOC's Issuance of a Fourth Subpoena and Determination in Favor of Itself on HNI's Petition to Modify or Revoke

Six months later, on January 23, 2012, the EEOC served yet another subpoena on HNI.  (See No. AT-12-026 [4-26] (the "Fourth Subpoena").)[13]  The Fourth Subpoena is a virtual carbon copy of the Third Subpoena.  The only differences between the Fourth Subpoena and the Third Subpoena are (1) that the Fourth Subpoena, by requesting documents through the present (January 23, 2012) requested documents received by HNI subsequent to its June 2011 response to the Third Subpoena, and (2) the Fourth Subpoena requests that HNI provide "access" to the requested documents for examination as opposed to producing or mailing the documents.  (HNI's Resp. 19.)  As such, the Fourth Subpoena requested access to over 13,000 pages of documents that HNI had mailed the EEOC six months earlier.  HNI asserts that the EEOC had apparently not reviewed the over 25,000 pages of documents that it had already produced.  If it had, the EEOC would not have requested

---

[13]  The EEOC asserts that it served the Fourth Subpoena "[d]ue to the Respondent's history of failing to comply with [its] requests."  (EEOC's Mem. 10.) Given the above summary of facts, that assertion does not ring true.

18

through the Fourth Subpoena access to over 13,000 pages of documents already in its possession–a production which had cost HNI tens of thousands of dollars to make. (HNI's Resp. 19 n.16.)

As a result, HNI was forced to file yet another petition to revoke or modify a subpoena on January 26, 2012. (See Pet. to Modify or Revoke the Fourth Subpoena [4-27].) HNI explained that it had transitioned primarily to an online application system, and therefore many of the "application packet documents" sought by the Fourth Subpoena did not exist. HNI agreed to produce all online applications received since its response to the Third Subpoena in June 2011. (Id.) HNI also renewed the relevancy and unduly burdensome objections made in its Petition to Modify or Revoke the Third Subpoena. (Id.). On February 21, 2012, HNI made its production pursuant to the Fourth subpoena, bringing its total production in this case to over 37,000 pages of documents. (HNI's Resp. 20.)

On February 20, 2013, the EEOC issued its Determination on HNI's Petition to Revoke or Modify the Fourth Subpoena [4-28], which had been pending for thirteen months. HNI asserts that the Determination was not written from an objective viewpoint, completely ignored the EEOC's abusive and wasteful investigation tactics, and summarily rejected each of HNI's objections to the EEOC's document requests.

(Id.)  HNI responded to the EEOC's Determination on March 8, 2013, explaining its disagreement with it and pleading one last time for the EEOC to meet and confer so that the parties could finally attempt to bring this Charge to a close.  (See letter [4-29] of Mar. 8, 2013 from D. Long-Daniels to Williams-Kimbrough.)[14]  When HNI represented that it would not comply fully with the Fourth Subpoena (see Williams-Kimbrough Decl. ¶¶ 4. v. and 5), the EEOC eventually filed the instant application for enforcement of its administrative subpoena.

## II.   **THE APPLICATION**

The Fourth Subpoena requests seven types of documents for each person who applied for employment at HNI for the period January 2009 through January 2012, regardless of whether the applicant was hired:

(1)   aid availability and information sheets;

(2)   HomeNurse work reference forms;

(3)   consumer report authorization and disclosure forms;

---

[14] This letter points out that the practice which gave rise to the EEOC's investigation–that of HNI providing a medical questionnaire to its applicants, which was done at the unfortunate advice of its workers' compensation insurance carrier–was discontinued in June 2010, but that the EEOC has repeatedly refused this small employer's entreaties to resolve this matter in conciliation.  As a result, HNI has had to spend $100,000 preparing spreadsheets and producing 37,000 pages of documents.  (See letter of Mar. 8, 2013 from D. Long-Daniels to Williams-Kimbrough.)

20

(4)    MVR authorization forms;

(5)    personal reference forms;

(6)    reference letter/performance evaluation forms; and

(7)    medical history questionnaires.

As noted above, HNI has produced all medical history questionnaires for the relevant time frame.  Thus, item (7) is not in dispute.

HNI has produced documents responsive to items (1)-(3) above (i.e., aid availability and information sheets; HomeNurse work reference forms; and consumer report authorization and disclosure forms) for unsuccessful applicants only.  The EEOC seeks additional documents responsive to items (1)-(3) for persons that HNI "hired, employed, or terminated" during the requested time period.  (EEOC's Reply Br. 10.)

HNI refused to produce any documents responsive to items (4)-(6) above (i.e., MVR authorization forms; personal reference forms; and reference letter/performance evaluation forms) on relevance grounds; the EEOC seeks production of documents responsive to these three categories for both successful and unsuccessful applicants during the requested time period.  (EEOC's Reply Br. 10.)  The EEOC avers that

21

HNI's failure to provide it with all the information requested has "delayed and hampered" its investigation.  (Williams-Kimbrough Decl. ¶ 5.)[15]

## III.   ANALYSIS

A district court's role in a proceeding to enforce an administrative subpoena is limited.  See EEOC v. Kloster Cruise Ltd., 939 F.2d 920, 922 (11th Cir. 1991).  The district court may not, for example, "assess the likelihood that the [EEOC] would be able to prove the claims made in the charge."  EEOC v. Shell Oil Co., 466 U.S. 54, 72 n.26 (1984).  A district court must enforce a subpoena if (1) the administrative investigation is within the agency's authority, (2) the agency's demand is not too indefinite or overly burdensome, and (3) the information sought is reasonably relevant.  See Inspector Gen. of U.S. Dept. of Ag. v. Glenn, 122 F.3d 1007, 1009 (11th Cir. 1997); EEOC v. Tire Kingdom, Inc., 80 F.3d 449, 450 (11th Cir. 1996).

---

[15] There is great irony in that averment.  The EEOC began this investigation in May 2010.  As the above facts show, the EEOC has taken its time with this matter, with long periods of inactivity between events.  For example, over six months elapsed between issuance of the Third and Fourth Subpoenas.  Thirteen months elapsed between HNI's filing of its Petition to Modify or Revoke the Fourth Subpoena and the EEOC's denial of that Petition.  And five months elapsed between HNI's refusal to comply fully with the Fourth Subpoena and the EEOC's filing of the instant Application.  Thus, any "delay" is clearly upon the EEOC, not HNI.

The burden of proving each of these three elements lies with the agency.  EEOC v. Roadway Exp., Inc., 580 F. Supp. 1063, 1066 (W.D. Tenn. 1984).  Even if the EEOC establishes these elements, a court may refuse enforcement where to do so would be a gross abuse of the EEOC's discretion, such as when the subpoena was issued for an improper purpose or the respondent has suffered substantial prejudice.  EEOC v. First Ala. Bank of Birmingham, 440 F. Supp. 1381, 1385-86 (N.D. Ala. 1977), aff'd, 611 F.2d 132 (5th Cir. 1980).[16]  HNI argues that the EEOC has failed to meet its burden as to all three factors.  The EEOC disagrees.  The Court considers the parties' arguments in turn below.

## A.     The Investigation is Outside the EEOC's Authority

HNI asserts that the EEOC has no authority to investigate Ms. Carroll's class allegations because she is not an aggrieved party under the governing statutes.  (HNI's Resp. 22-28.)  HNI relies upon the statutory language and two district court decisions: EEOC v. McLane Co., No. CV-12-615-PHX-GMS, 2012 WL 1132758 (D. Ariz. April 4, 2012) (hereafter "McLane I"), and EEOC v. McLane Co., No. CV-12-02469-PHX-GMS, 2012 WL 5868959 (D. Ariz. Nov. 19, 2012) (hereafter

_____

[16] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981.  Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

"McLane II").  The EEOC contends that a subpoena enforcement proceeding is not the proper forum to litigate this argument, and that the McLane cases are distinguishable. (EEOC's Reply Br. 4-8.)

EEOC investigations under Title VII, the ADA, and/or GINA are triggered by the filing of a charge.  See Univ. of Penn. v. EEOC, 493 U.S. 182, 190 (1990).[17]  A charge may be filed "by or on behalf of a person claiming to be aggrieved, or by a member of the Commission."  See 42 U.S.C. § 2000e-5(b); 42 U.S.C. § 12117(a); and 42 U.S.C. § 2000ff-6(a).  There are thus three categories of charges that may give rise to an EEOC investigation:  "those brought by an aggrieved person herself, those brought by someone on behalf of an aggrieved person, and those brought by a member of the Commission on behalf of an aggrieved person.  The common statutory requirement, though, is an aggrieved person."  McLane II, 2012 WL 5868959, at * 3.

In keeping with those statutory requirements, the EEOC has issued the following regulation for charges not made by a member of the Commission:

_____

[17] The EEOC may initiate an investigation under the ADEA without a charge. See 29 U.S.C. § 626(a).  However, the EEOC does not argue here that it may ignore the charge under which it has proceeded to investigate ADEA claims.  Instead, the EEOC argues that its investigative powers under the ADEA are the same as under Title VII.  (EEOC's Mem. 12.)

24

**§ 1601.7  Charges by or on behalf of persons claiming to be aggrieved.**

(a)   A charge that any person has engaged in or is engaging in an unlawful employment practice within the meaning of title VII, the ADA, or GINA may be made by or on behalf of any person claiming to be aggrieved.  A charge on behalf of a person claiming to be aggrieved may be made by any person, agency, or organization.  The written charge need not identify by name the person on whose behalf it is made.  The person making the charge, however, must provide the Commission with the name, address and telephone number of the person on whose behalf the charge is made.  During the Commission investigation, Commission personnel shall verify the authorization of such charge by the person on whose behalf the charge is made.  Any such person may request that the Commission shall keep his or her identity confidential.  However, such request for confidentiality shall not prevent the Commission from disclosing the identity to Federal, State or local agencies that have agreed to keep such information confidential.  If this condition is violated by a recipient agency, the Commission may decline to honor subsequent requests for such information.

29 C.F.R. § 1601.7.

There is no dispute that Ms. Carroll is an "aggrieved party" within the meaning of the statutes and the regulation with regard to her retaliation claim.  Therefore, the EEOC has jurisdiction to investigate whether HNI retaliated against her.  However, as discussed in more detail below, Ms. Carroll is not an "aggrieved party" with regard to the class allegations of her Charge.

McLean II is instructive on this point.  In that case, Damiana Ochoa filed a charge against McLean alleging both sex and disability discrimination over its use of

25

the Industrial Physical Capacity Services Physical Capacity Exam ("IPCS PCE").

McLean II, 2012 WL 5868959, at *1.

> She alleged that she failed the IPCS PCE three times after returning to
> work from maternity leave, and consequently believed she has "been
> discriminated against because of [her] sex, female (pregnancy) in
> violation of Title VII of the Civil Rights Act of 1964, as amended." (Id.)
> She also made the following claim: "The Physical Capability Strength
> Test is given to all employees returning to work from a medical leave and
> all new hires, regardless of job position.  I believe the test violates the
> Americans with Disabilities Act of 1990, as amended." (Id.)

Id.

The EEOC began an investigation and issued a subpoena to McLean for a variety of information about its administration of the test, which the employer declined to produce, leading the EEOC to issue a subpoena.  McLean II, 2012 WL 5868959, at *1.  The district court enforced the subpoena regarding that portion of Ms. Ochoa's charge alleging sex discrimination, as she clearly was an aggrieved party.  McLean II, 2012 WL 5868959, at *4.  However, with regard to the second claim in Ms. Ochoa's charge–that she believed the test discriminated on the basis of disability–the district court found that the EEOC had no jurisdiction to investigate an alleged ADA violation, reasoning as follows:

> The statute requires that a charge be tied to a specific aggrieved party.
> See 42 U.S.C. § 2000e5(b) (charges to be filed "by or on behalf of a

26

person claiming to be aggrieved"). The charge does not mention any instance of discrimination on the basis of disability. Ochoa does not claim she is disabled. The parties agreed at the hearing that pregnancy is not typically a disability within the meaning of the ADA, and that Ochoa does not appear to have had the sort of atypical pregnancy that would trigger the ADA. In addition, Ochoa does not purport to bring the ADA charge for another aggrieved party. She instead makes a blanket assertion that the test violates the ADA. Such a charge does not comport with the statute. To ignore the plain language of the statute and to allow the EEOC to investigate a generalized charge of discrimination that is untethered to any aggrieved person would invite the oft-cited "fishing expedition," Peters v. U.S., 853 F.2d 692, 699-700 (9th Cir. 1988), to become a full-blown harvest operation. If anyone could file a charge–devoid of a specific aggrieved party–that asserts that such-and-such policy discriminates on any number of bases, the E.E.O.C. would have close to unlimited jurisdiction, and it would make virtually limitless any investigation the EEOC wished to undertake.

Id.

That same reasoning applies here. As noted above, the statutes require that a charge be tied to a specific aggrieved party. However, Ms. Carroll's Charge does not mention any specific instance of discrimination on the basis of disability, pre-existing genetic conditions, age, or race. As also previously noted, Ms. Carroll does not claim that she is disabled, that she has a pre-existing genetic condition, that she is age 40 or over, or that she is black. Moreover, Ms. Carroll's charge does not purport to be brought on behalf of an aggrieved party (i.e., one who is disabled, has a pre-existing genetic condition, is age 40 or over, or black). Instead, like the charging party in

27

<u>McLean II</u>, Ms. Carroll's Charge makes blanket assertions that HNI violated the ADA, the GINA, the ADEA, and Title VII.  As such, her Charge does not comport with the requirements of the statutes.  Like <u>McLean II</u>, this Court cannot allow the EEOC to investigate a generalized charge of discrimination that is untethered to any aggrieved person.

The EEOC attempts to distinguish <u>McLean II</u> by arguing that, unlike Ms. Ochoa, Ms. Carroll "specifically filed a charge on behalf of aggrieved individuals under the ADA, the ADEA, GINA, and Title VII."  (EEOC's Reply Br. 7.)  However, there is no reference on the face of the Charge indicating that Ms. Carroll filed it on behalf of others. Although the governing regulation, 29 C.F.R. § 1601.7 (quoted <u>supra</u>) provides that the charge "need not identify by name the person on whose behalf it is made" (<u>id.</u>), Ms. Carroll was required to "provide the Commission with the name, address and telephone number of the person on whose behalf the charge is made" (<u>id.</u>).  The EEOC has never asserted that Ms. Carroll did this.  Moreover, the regulation requires that, "[d]uring the Commission investigation, Commission personnel shall verify the authorization of such charge by the person on whose behalf the charge is made."  (<u>Id.</u>) Thus, even if Ms. Carroll had made her Charge on behalf of others, the EEOC has not asserted that its personnel have verified whether Ms. Carroll was authorized to do so.

AO 72A

(Rev.8/82)

Therefore, despite the broad language of the Charge, Ms. Carroll filed it only on behalf of herself.

Although the EEOC claims that the Charge makes specific allegations that HNI discriminated against applicants in violation of the ADA, the ADEA, the GINA, and Title VII (EEOC's Reply Br. 8), the only discriminatory policy alleged was that of conducting criminal record checks, which has a claimed adverse impact on African Americans. The Charge fail to state what practice(s) by HNI allegedly violated the ADA, the GINA, or the ADEA. Indeed, HNI asserts (with no objection from the EEOC) that, over three years into this investigation, the EEOC has failed to identify one person who claims to have been aggrieved by the purported class allegations. (HNI's Resp. 5.)[18]

_____

[18] The lack of an aggrieved party is often litigated on the merits and resolved in a manner consistent with this Court's conclusion. For example, in Jackson v. Deen, No. CV412-139, 2013 WL 4078292 (S.D. Ga. Aug. 12, 2013), the court concluded that the Caucasian plaintiff was not an aggrieved party under Title VII because her interests were not those arguably sought to be protected by that statute; at best, plaintiff was an accidental victim of the alleged racial discrimination, because there are no allegations that the defendant's racially offensive comments were either directed toward plaintiff or made with the intent to harass her. Id. at *6. Similarly, in Cochran v. Five Points Temporaries, LLC, 907 F. Supp. 2d 1260 (N.D. Ala. 2012), a Caucasian employee was not a "person aggrieved," and thus, lacked standing to bring a Title VII claim for racially hostile work environment based on alleged derogatory statements and placement practices concerning African-American employees, absent allegations that the employer engaged in discrimination against its African-American employees with

29

The EEOC cites <u>EEOC v. Rinella & Rinella</u>, 401 F. Supp. 175 (N.D. Ill. 1975), to support its argument that Ms. Carroll filed her charge on behalf of others.  However, as shown below, that decision supports HNI's position.  In that case, an organization called "Women Employed" filed a charge against the Rinella and Rinella law firm, asserting that it had discriminated against Arlene Nagy, a member of Women Employed, in violation of Title VII.  <u>Id.</u> at 177-78.  In rejecting that employer's argument that Women Employed lacked standing to file a charge on behalf of Ms. Nagy, the court held that Section 706(b) of Title VII, 42 U.S.C. § 2000e-5(b), "provides for claims filed 'by or on behalf of a person claiming to be aggrieved.'"  <u>Id.</u> at 182.  Moreover, the court found the following execution of the charge by Women Employed to be in compliance with the EEOC's regulation (then codified at 29 C.F.R. § 1601.6):

> Women Employed on behalf of Arlene Nagy and other similarly situated women,
>
> is affirmed by Harriet Wessling, Co-sponsor, Women Employed Secretaries Committee, to be true to the best of her knowledge, information and belief, and therefore comports with the requirements of Title VII and was properly filed.

---

the intent to harm or affect the Caucasian employee or that any harassment or discrimination was directed at the Caucasian employee because of her race or her relationship with African-American coworkers.  <u>Id.</u> at 1268-69.

30

Rinella & Rinella, 401 F. Supp. at 183.  As noted above, Ms. Carroll's Charge was not executed in that manner.

Finally, the EEOC argues that the charging party's lack of standing does not bar it from fulfilling its statutory role of investigating the Charge.  (EEOC's Reply Br. 8, citing EEOC v. Gen. Elec. Co., 532 F.2d 359, 373 (4th Cir. 1976), and EEOC v. Occidental Life Ins. Co. of Cal., 535 F.2d 533, 542 (9th Cir. 1976).)  These cases are inapposite, as they do not address whether a subpoena should be enforced when an EEOC investigation is, as here, untethered to an aggrieved person.  Instead, in both cases, during a reasonable investigation of the charging party's allegations, the EEOC uncovered other bases of alleged discrimination.  Later, after finding cause and failing conciliation, the EEOC filed its own suits.  These courts in those two cases simply held that the inability of the charging parties in General Electric (black men) to sue for sex discrimination, and the inability of the charging party in Occidental Life (a married woman) to sue for sex discrimination against unmarried women and males, was no bar to the EEOC's own suits making those claims.

In sum, because there is no aggrieved party for the allegations in Ms. Carroll's Charge that HNI violated the ADA, the ADEA, the GINA, and Title VII against a class

31

of persons, the subpoena seeks information outside of the EEOC's authority. Therefore, the EEOC's Application is **DENIED** and the Fourth Subpoena **QUASHED**.

### B.   The Information Sought is Not Reasonably Relevant[19]

#### 1.   Documents HNI Produced for Unsuccessful Applicants

As noted above, HNI produced documents responsive to items (1)-(3) of the Fourth Subpoena (i.e., aid availability and information sheets; HomeNurse work reference forms; and consumer report authorization and disclosure forms) for unsuccessful applicants only.  The EEOC seeks additional documents responsive to items (1)-(3) for persons that HNI hired, employed, or terminated during the requested time period.

HNI shows that applicants complete the aid availability and information sheet to show his/her available work schedule if hired.  The HomeNurse work reference form provides an applicant's prior work history.  The consumer report authorization and disclosure document discloses to applicants that HNI may perform a background check and allows the applicant to authorize its procurement.  Some applicants may

---

[19] The analysis <u>infra</u> Parts III. B.-C. assumes that the EEOC has authority to investigate the class claims despite the absence of an aggrieved party. The requested information is certainly not relevant to the only claim tethered to an aggrieved party–retaliation.

32

disclose their prior convictions on this form.  As noted above, pursuant to Georgia law and Medicaid rules, HNI cannot employ individuals who have been convicted of certain crimes.  (HNI's Resp. 30-31.)

HNI has already produced these three categories of documents for persons who applied but were not hired during the relevant time frame.  The Court agrees with HNI that the above three categories of documents have no relevance to individuals that HNI agreed to hire.  No further production is required.

### 2.    Documents HNI Did Not Produce

HNI refused to produce any documents responsive to items (4)-(6) of the Fourth Subpoena  (i.e., MVR authorization forms; personal reference forms; and reference letter/performance evaluation forms) on relevance grounds; the EEOC seeks production of documents responsive to these three categories for both successful and unsuccessful applicants during the requested time period.

HNI shows that the MVR authorization form authorizes HNI to check the applicant's driving history to determine if s/he may be employed pursuant to the Company's insurance requirements. (HNI's Resp. 31.) With respect to both applicants and employees, the Court agrees with HNI that the MVR authorization form has no

33

relevance to any claims in this matter.  Therefore, HNI is not required to produce these forms.

The personal reference form requests that an applicant provide three personal references and their contact information.  (HNI's Resp. 31-32.)  With respect to both applicants and employees, the Court agrees with HNI that this document has no relevance to any claims in this matter.  Moreover, the request would call for private and confidential information of individuals who never even applied for work at HNI. Therefore, HNI is not required to produce these forms.

By signing the reference letter/performance evaluation form, an applicant authorizes prior employers to release information to HNI concerning his/her work history.  The form is merely an authorization, and HNI asserts that it is not aware of any instances where this form contains information concerning the applicant's prior work history.  (HNI's Resp. 32.)  Accordingly, with respect to both applicants and employees, the Court agrees with HNI that this form has no relevance to any claims in this matter and need not be produced.  Therefore, HNI is not required to produce these forms.

34

**C.**     **The EEOC's Demands Are Overly Burdensome**

A subpoena may be unduly burdensome if either (1) "the cost of gathering this information is unduly burdensome in the light of the company's normal operating costs," or (2) "gathering the information would threaten [a respondent's] normal business operations." <u>EEOC v. Md. Cup Corp.</u>, 785 F.2d 471, 479 (4th Cir. 1986).

HNI asserts that vast majority of the requested documents are located in paper personnel files that have been placed in storage.  To comply with the Fourth Subpoena, HNI shows that it would have to go through literally thousands of personnel files to find and extract the applicable documents.  HNI asserts that it has already undertaken this endeavor once in attempting to cooperate with the EEOC's three subpoenas–an endeavor that has resulted in HNI temporarily reassigning staff to meet the EEOC's demands, producing over 37,000 pages of documents, and incurring over $100,000 in expense.  (Able Decl. ¶ 8).  HNI argues that the EEOC's tactics in investigating the class allegations, which still lack an aggrieved party, have been a penalty in and of themselves, and that the EEOC now seeks to perpetuate that penalty and cause even more expense to HNI by making it locate and produce documents that will have no benefit to the EEOC's investigation.  To HNI, this is the epitome of undue burden, as well as arbitrary, stubborn and litigious behavior.  (HNI's Resp. 34.)

The EEOC cites numerous cases that it filed against large corporate employers, and asserts that it would not be unduly burdensome for HNI to spend even more of its limited funds and its employees' time responding to the Fourth Subpoena. (EEOC's Mem. 19-21.) EEOC actions against large corporations are not comparable to what has occurred here.   A large business can incur more expense than a small one in responding to requests and, because it has more personnel, it can do so in a manner that does not disrupt its business.  But, HNI has already spent $100,000 trying to comply with requests for information that the EEOC had no authority to obtain, and in doing so reassigned employees from running the business or assisting its customers to search for documents.  Given what has already transpired here, any further production would be unduly burdensome as too costly and a threat to this small business's operations.

## IV.   **CONCLUSION**

The EEOC's highly inappropriate search and seizure operation, its failure to follow its own regulations, its foot-dragging, its errors in communication which caused unnecessary expense for HNI, its demand for access to documents already in its possession, and its dogged pursuit of an investigation where it had no aggrieved person, constitutes a misuse of its authority as an administrative agency.  For whatever reason, the responsible EEOC investigators and attorneys have repeatedly refused this

small employer's entreaties to resolve this case quickly and in a cost-effective manner. The by-product of all of this obstinance is a small employer with a large attorney's fee bill and an unnecessary squabble in federal court.[20]  Although the standards governing enforcement of an administrative subpoena are low, the EEOC has not met them here.

The federal courts stand as a bulwark to protect this nation's citizens from powerful government agencies that seek to run roughshod over their rights.  It would be an abuse of this Court's process to enforce the instant subpoena.  Therefore, for the reasons stated above, the Court **DENIES** the EEOC's Application and **QUASHES** the Fourth Subpoena.

The Clerk is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO ORDERED**, this 30th day of September, 2013.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

---

[20] HNI fleetingly asks this Court to "require the EEOC to pay the reasonable fees and costs incurred" in responding to the Application.  (HNI's Resp. 35.)  Although the Court is sympathetic to that request, HNI has not cited any authority supporting that request or provided an exact amount of its fees and costs.

AO 72A

(Rev.8/82)